119-08/WLJ/JPG
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
FREE WAVE SHIPPING COMPANY INC.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska (WJ 0772)
Jan P. Gisholt (JG 3768)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 2153**

------------------------------------------------------------------x

FREE WAVE SHIPPING COMPANY INC.,



                                        Plaintiff,

        - against –

PRIME GLOBAL COMMODITIES TRADING
LIMITED,

                                        Defendant.



VERIFIED COMPLAINT

------------------------------------------------------------------x

    Plaintiffs FREE WAVE SHIPPING COMPANY INC. (hereinafter "FREE WAVE"), by

its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against

Defendants PRIME GLOBAL COMMODITIES TRADING LIMITED (herein after "PRIME

GLOBAL") allege upon information and belief as follows:

    1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's federal question

jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action

arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.   At all times relevant hereto, Plaintiff FREE WAVE SHIPPING COMPANY INC. was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Edificio de Prado, Piso 7, Suite 7A, Via Argentina, Panama.

3.   At all times relevant hereto, Defendant PRIME GLOBAL COMMODITIES TRADING LIMITED was and still is a foreign business entity existing under the laws of a foreign country with an office and place of business in London, England, and with a postal address of 8 Upper Brook Street, Mayfair, London W1K 6PA, UK.

4.   FREE WAVE, as owner, entered into a maritime contract of charter party with PRIME GLOBAL, as charterer, under a charter recapitulation dated December 12, 2007[1] (the "Charter") to carry 26,000 metric tons of iron ore fines in bulk (plus or minus 10% in FREE WAVE's option) from Misurata, Libya to Lanshan, China aboard the M/V MARGARITA M ("Vessel"). The agreed freight rate for the shipment was US$ 85.00 per metric ton. A copy of the Charter is attached hereto as Exhibit A.

5.   Based on the terms of the Charter, the Vessel arrived at Misurata, Libya on December 21, 2007 and provided a loading plan to the Port Agent, declaring 26,400 metric tons of cargo to be loaded.

6.   Upon completion of loading on December 26, 2007, the vessel had only loaded 24,472.039 metric tons of cargo. See copy of the bill of lading attached hereto as Exhibit B.

7.   PRIME WAVE loaded 1,927.96 metric tons less than it was contractually obligated to load and was thus in breach of the Charter.

---

[1] The recapitulation incorporated the "details" of a prior charter party M/V LERONG dated November 27, 2007, with logical amendments.

NYDOCS1/299840.2                              2

8.  The master of the Vessel issued a Letter of Protest based on the failure to provide the cargo quantity agreed under the terms and conditions of the Charter.

9.  PRIME GLOBAL breached the Charter by failing to provide the additional minimum 1,927.96 metric tons of cargo.

10. Freight owed an owner based on a charterer's failure to provide the minimum quantity of cargo agreed in a charter is known in the maritime community as "deadfreight."

11. The Charter between FREE WAVE and PRIME GLOBAL provides for disputes to be resolved by arbitration at London, England, with English law to apply.  See Exhibit A, Recapitulation Page 5 of 7.

12. FREE WAVE satisfied all of its obligations under the Charter with PRIME GLOBAL.

13. PRIME GLOBAL owes FREE WAVE damages for breach of Charter (deadfreight) in the sum of **$159,779.68**[2], no part of which has been paid, though duly demanded.

14. FREE WAVE has commenced arbitration in London with PRIME GLOBAL pursuant to the terms of the Charter.

15. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for FREE WAVE's claims made or to be made in arbitration in London, England under English law, as agreed by the parties.

16. As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements and the cost of the arbitration, all of which constitutes a part of the Plaintiffs' claim and the amount sued for herein.

---

[2] 1,927.96 metric tons X $85.00 less 2.5% "address commission" to PRIME GLOBAL as per the Charter.

17. FREE WAVE estimates that it will incur approximately £20,000 (US$ 39,667.00) in awardable attorney's fees, disbursements, and costs of the arbitration.

18. Interest is also typically awarded under English law and arbitration, regularly at the rate of LIBOR plus 1-2% compounded quarterly (approximately 6.5%). FREE WAVE estimates that the arbitration in this action will be resolved in approximately two and one-half years. Accordingly, FREE WAVE estimates that it will be awarded approximately $27,864.60 in interest, which also constitutes a part of the Plaintiff's claim and the amount sued for herein.

19. In all, the claim for which FREE WAVE sues in this action, as near as presently may be estimated, totals **$227,311.28**, no part of which has been paid by PRIME GLOBAL. FREE WAVE specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure FREE WAVE.

20. Upon information and belief, and after investigation, Defendant PRIME GLOBAL cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of Defendant PRIME GLOBAL (hereinafter, "ASSETS"), including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

**WHEREFORE**, Plaintiff FREE WAVE prays:

a.  That process in due form of law according to the practice of this Court issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it in the principal amount of **$159,779.68** plus interest, costs and attorneys fees;

b.  That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of **$227,311.28,** be restrained and attached, including but not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.  That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.  For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        March 4, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
FREE WAVE SHIPPING COMPANY INC.

By: _____

William L. Juska (WJ 0772)
Jan P. Gisholt  (JG 3768)
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax

Exhibit A

## MAZZA, CLARE

**From:**   mail@garship.com
**Sent:**   Wednesday, January 16, 2008 10:28 AM
**To:**   Bourogiannopoulou Eugenia
**Subject:** Doc-No. 1224543

From: Garship Ltd [mailto:mail@garship.com]

Doc-No. 1224543  16/JAN/2008  15:27 (UTC) SG

ATTN: Eugenia Bourogiannopoulou

AS PER REQUEST .. C/P WORKING ON IT WILL SEND IT ASAP..

+++++++++++++++++

RECAP OK EXCEPT CLS 24 LINES 156-160 DELETE

MANY THANKS FOR THE FITURE.

BEST REGARDS

From: Garship Ltd [mailto:mail@garship.com]

Doc-No. 1196653  13/DEC/2007  11:01 (UTC) SG

FM: GARSHIP LTD

HOWARD / SHAH

MV MARGARITA M / PRIMEGLOBAL CP DATED 12 /12/07

MANY THANKS HEREUNDER PLEASE FIND FULL FIXTURE RECAP  AS AGREED .

MV MARGARITA M - T/C DESCRIPTION
-------------------------------
-EX-SAMSUN APOLLO -EX-DOOYANG FRONTIER
:FLAG: PANAMA
-PORT OF REGISTRY:PANAMA OFF.NO.35723-PEXT
-CALL SIGN: 3EKU4
-BUILT: JULY/1977 -JAPAN
-YARD NAME: TSUNEISHI SHIPBUILDING,JAPAN
-CLASS: KOREAN REGISTER OF SHIPPING -NO.7720808
-IMO NUMBER: 7633076

2/29/2008

-TYPE OF VESSEL: BULK CARRIER

-OWNERS:
FREE WAVE SHIPPING COMPANY INC.
EDIFICIO DE PRADO
PISO 7 SUITE 7A
VIA ARGENTINA - PANAMA

REPUBLIC OF PANAMA

-MANAGERS:
EPIDAURUS SA
31/33, D.GOUNARI STR.,   TEL: +30 210 4225 071
P.O.BOX 80.234          FAX: +30 210 4225 075
185 31 PIRAEUS          TLXS: 213287 EPID / 212274 MITS GR
GREECE              INTERNET E-MAIL: epidship@hol.gr


-PANDI CLUB: THE WEST OF ENGLAND (HELLAS) LTD.

-DEADWEIGHT ALL TOLD IN M/T:
-DWAT / DRAFT / TPC BASIS FULL DRAFT
------------------------------------
-SUMMER 27,307 MT ON 10.564 SW/TPC 34.70 MT
-WINTER 26,544 MT ON 10.344 SW/TPC 34.50 MT
-TROPICAL 28,072 .T ON 10.784 SW/TPC 34.80 MT

-PANAMA CANAL: FITTED
-SUEZ CANAL : FITTED
-GRT/NRT: INTERNATIONAL: 15,853/ 9,204
     SUEZ      : 16,627/13,999
     PANAMA    : 17,515.43/13,898.99

-LENGTH OVERALL: 177.05
-LENGTH BP   : 169.75
-BREADTH     : 22.86
-DEPTH MOULDED : 14.10
-CARGO ARRANGEMENTS
--------------------
-NUMBER OF HOLDS:  6
-NUMBER OF HATCHES: 6
-VESSEL'S HOLDS ARE CLEAR AND FREE OF ANY OBSTRUCTIONS.
-GRAIN/BALE CAPACITIES EXCL.TOP SIDE TANKS BUT INCL.HATCHWAYS.
-HOLDS CAPACITY    GRAIN/ BALE
-NO.1 :     4,345.00 / 4,188.20
-NO.2 :     5,457.90 / 5,244.40
-NO.3 :     5,609.20 / 5,386.00
-NO.4 :     5,609.20 / 5,386.00
-NO.5 :     5,609.20 / 5,385.80
-NO.6 :     5,716.50 / 5,498.30
       ----------- -------------
-TOTAL     32,347.00 /31,088.70

-NUMBER OF HATCHES: 6

2/29/2008

-TYPE OF HATCHCOVERS: MCGREGOR SINGLE PULL.
-HATCH SIZES IN METRES:
-NO.1 :  12.33 X 10.00 MTRS
-NO.2-6:  12.75 X 10.00 MTRS

-FLAT FLOOR MEASUREMENT OF CARGO HOLDS AT TANK TOP:
NO.1: F7000  X A16450 X L18500

NO.2: F16200 X A17200 X L19600
NO.3: F17200 X A17200 X L20600
NO.4: F17200 X A17200 X L20600
NO.5: F17200 X A17200 X L20600
NO.6: F17200 X A14400 X L19600

-THE TANKTOP IS STEEL AND SUITABLE FOR GRAB DISCHARGE.
-BULKHEAD CORRUGATIONS: VERTICAL
-ALTERNATE HOLD LOADING NOT PERMITTED.HOLDS 2 AND 5 CAN BE
LEFT EMPTY PROVIDED BALLAST/OIL SUITABLY STORED AND UNDER
MASTER'S DESCRETION.
-VESSEL,S HOLDS ARE CO2 FITTED.
-THE VESSEL IS AUSTRALIAN HOLD LADDERS FITTED.
-THE HOLDS ARE HOPPERED AT HOLD SIDE.
-HOPPER HIGH FROM TANK TOP /HOPPERING: 2.88 M
-CARGO GEAR:
-----------

-IHI HYDRAULIC CRANES 4 X 15 TONS PLUS 1 X 10 TONS
-MAX OUTREACH BEYOND SHIP'S RAIL 20 M
-BEYOND SHIP'S RAIL WITH MAX CARGO ON HOOK 8.75 M
-TIME NEEDED FOR FULL CYCLE WITH MAX CARGO ABT 4 MIN
-VESSEL IS NOT GRAB FITTED
-VESSEL IS NOT LOGS FITTED.

-CAPACITY OF BALLAST TANKS : 7,891 M3
-NO CARGO HOLD IS FLOODABLE
-FRESH WATER CAPACITY :      265 M3
-DAILY FRESH WATER CONSUMPTION: 12 MT

-VESSEL'S BALLASTING AND DEBALLASTING:
BALLASTING: 20 HOURS - DEBALLASTING: 30 HOURS
-CONSTANTS EXCLUDING FRESH WATER: APPROX.320 MT

-VESSEL'S ONBOARD ELECTRICAL SUPPLY VOLTS/HZ: 110V / 60HZ
-VESSEL'S HOLDS ARE NOT ELECTRONICALLY VENTILATED.NATURAL
VENTILATION.
-DISTANCE FM WATERLINE TO TOP OF HATCH COAMING: 10.60 M
-DISTANCE FM KEEL TO TOP OF HATCH COAMING    : 16.05 M
-DISTANCE FM KEEL TO HIGHEST POINT        : 39.40 M
-DISTANCE FM SHIP'S RAIL TO NEAR EDGE OF HATCH
COVERS/COAMING:                : 6.00 M
-DISTANCE FM BOW TO FORE OF FIRST HOLD OPENING: 20.60 M
-DISTANCE FM STERN TO AFT OF LAST HOLD OPENING: 40.67 M
-TANK TOP STRENGTH
--------------------

-NO.1 20.5 T/M2 - NO.2-6 18.5 T/M2

2/29/2008

-DECK: NO.1 3.9 T/M2 NO.2-6 2.7 T/M2
-CANNOT LOAD ON HATCH COVERS.

-MAIN ENGINE TYPE: MITSUI B+W 6K74EF 2 CYCLE SINGLE ACTING
DESIGNED 11600 BHP -124.
-SPEED / CONSUMPTION
------------------

-BALLAST ABT 13.0 KNOTS ON 22MT (180 CST)+ 1.8 MT DO AT SEA.
-LADEN ABT 12.5 KNOTS ON 23 MT FUEL + 1.8 MT DO AT SEA.
-IN PORT 1.6 MT FUEL + 1.5 DO (IDLE)/1.8 MT DO( WORKING)
-VESSEL BURNS DIESEL OIL WHILST MANOEVERING IN/OUT PORTS,
BERTHS,CANALS,RIVERS AND RESTRICTED WATERS.
-BUNKER GRADES: FUEL 180 CST-RME 25
        MDO - DMA OR DMB

-VESSEL IS NOT ITF FITTED BUT WITH A BONA FIDE TRADE UNION
AGREEMENT.
-VESSEL IS GRAIN FITTED WITHOUT REQUIRING BAGGING/STRAPPING AND
SECURING.

- H+M INSURANCE VALUE: 6 MIL
- IS SHE STRENGTHENED IN NO 1 TO LOAD CARGO BELOW 20 CUFT: YES
- IS SHE APPRENDIX A AND B: REVERTING
- WHAT ARE VSL'S COMMUNICATION DETAILS:
 TLX: 437283010 MARM
 EML: 437283010@inmc.eik.com (FOR DATA ONLY)
 TEL/FAX: REVERTING
- CREW NATIONALITY: ALL PHILIPPINO

+++++++++++++


- CARGO: 26000mt 10pct MOLOO OF LAWFUL HARMLESS IRON ORE FINE IN BULK INCLUDING
  PELLETS,CARGO TO BE LOADED AS IMO REGS


- LOADPORT: 1GSBP MISURATA (CHTR GUARANTEE MIN 10.5M DRAFT SW)


- DISCHPORT: 1 SB 1SP CHINA INCLUDING YANGTZE RIVER PORTS(BUT NO MORE WEST PORTS THAN CHANGZHOU), TO
BE DECLARE WITH 10 DAYS AFTER VSL SAL FROM LOADING PORT.


- NO OTHER LIMITATION FOR CAPTIONED VSL


- LAYCAN: 21ST TO 24TH, DEC


- LOADRATE: 5500 MTONS PWWD TAFHEX


- DISCHRATE: 10000MTS PWWD SHINC OF 24 CONS HRS AT D/PORT

2/29/2008

- LAYTIME BEGINS TO COUNT 12 HOURS FROM NOR TENDERED AT BENDS UNLESS SOONER LOADING, COMMENCE IN WHICH CASE ACTUAL TIME USED TO COUNT.

-DEMURAGE: USD23000 PDPR  HDWTSBENDS

-DEMURRAGE AT LOADING PORT, IF ANY, TO BE SETTLED 5 DAYS WITHIN COMPLETION OF LOADING. DEMURRAGE AT DISCHARGING PORT, IF ANY, TO BE SETTLED WITHIN 15 DAYS  AFTER COMPLECTION OF DISCHARGE.

-DESPATCH AT LOADING PORT, IF ANY, TO BE DEDUCTED FROM OCEAN FREIGHT. DESPATCH AT DICHARGING PORT, IF ANY, TO BE SETTLED WITHIN 5 DAYS WITHIN COMPLETION OF DICHARGING.

-FREIGHT: USD 85.00 PMT FIOT BSS 1/1 BSS

-100% FRT TO BE PREPAID TO OWRS' NOMINATED BANK A/C WITHIN 3 BANKING DAYS AFTER SIGN BILLS OF LADING. BS/L MARKED 'FREIGHT PAYABLE AS PER CHARTER PARTY'...ONCE OWNERS HAVE RECEIVED IRREVOCABLE CONFIRMATION FROM CHRRS BANK THAT

  FULL FRT HAS BEEN REMITTED TO OWNERS NOMINATED BANK, OWNERS WILL INSTRUCT
  AGENTS TO RELEASE BILLS OF LADING ACCORDINGLY."

-FREIGHT TO BE DEEMED AS EARNED UPON CARGO ON-BOARD, DISCOUNTLESS, NON-RETURNABLE SHIP AND/OR CARGO LOST OR NOT.

- NOR CAN BE TENDERED ATDNSHIC BENDS. LAYTIME TO COMMENCE 12 RUNNING HRS AFTER NOR TO BE TENDERED. IF LDG COMM EARLIER, ACTUAL TIME USED TO COUNT AS LAYTIME.

- BS/L FIGURES SHALL BE AS PER DRAFT SURVEY TO BE CARRIED OUT JOINTLY BY MARINE SURVEYOR AND MASTER A/O CH.MATE

- NOR SHALL BE TENDERED WITH CLEAN HOLDS /HATCH AND READY TO LOAD AT ANY TIME AFTER VSL HAS ARRIVED AT LOADPORT WWWW,

- SHIFTING TIME AND EXPENSES BETWEEN LOADING/DISCHG BERTHS TO BE FOR CHARTERER'S . THE FIRST SHIFTING TIME FM ANCHORAGE TO BERTHS NOT TO COUNT AS LAYTIME UNLESS ON DEM.

- GA/ARBITRATION IN LONDON AND ENGLISH LAW TB APPLIED, GA TO BE SETTLE ACCORDING TO LATEST UP DATE OF RULES.

- IF ORIGINAL B/L CAN NOT BE PRESENTED AT DISPORT, OWRS/MASTER AGREE TO DISCH CGO AGAINST CHRTS AND RCVRS LOI IN OWNERS PNI CLUB WORDING,

2/29/2008

- ANY TAXES AND/OR DUES ON CARGO TO BE FOR CHARTERERS ACCOUNT, SAME ON VESSEL/FREIGHT TO BE FOR OWRS' ACCOUNT

- CHTRS AGENT AT LOADING PORT SUB TO REASONALBE PORT D/A, OWRS AGT AT DISCHARGING PORT.

- OAP (IF ANY) FOR CHRTRS A/C.

- OVERTIME TO BE FOR THE ACCOUNT OF PARTY ORDERING. EXCEPT FOR OFFICERS AND CREW OVERTIME WHICH SHALL ALWAYS BE FOR OWNERS ACCOUNT.

- WAR RISKS CLAUSE "VOYWAR 1993" TO BE DEEMDED TO BE INCORPORATED INTO THIS CHARTER PARTY.

- GENERAL AVERAGE, IF ANY, TO BE SETTELD ACCORDING TO YORK/ANTWERP RULE 1974.
  GA TO BE SETTLE ACCORDING TO LATEST UP DATE OF RULES.

- THIS FIXTURE TO BE TREATED PRIVATE AND CONFIDENTIAL AND NOT TO BE REPORTED.

- SUB OTHERS DETAILS AS PER MV LE RONG CP  WITH LOGGICALLY AMENDED

- 2.5PCT ADDS  PLUS 1.25 PCT TO GARSHIP LTD

C/P DETAILS

- BOX 4 ADD DOMICILED ( UK )

- PARA 5 LINE 71-75 WILL BE ADDED WHEN DRAWING UP C/P

- CLAUSE 24 DELETE

- CLAUSE 33  DELETE

- ADD NOTICES ON SAILING AND THEREAFTER EVERYDAY TO "PRIMEGLOBAL@AOL.COM
 AND TO LOADPORT AGENT "  : UNIVERSAL SHIPPING AGENCIES MISURATA LIBYA
EMAIL(S)? umisurata@yahoo.com, universalmisurata@yahoo.com, shipping.mis@unishipco.com, agency.mis@unishipco.com, fax: 00218-51-2742670 /? 00218-51-2624553 "

END

REGARDS
SHAH GAZZALI
ABO

2/29/2008

BLACK BERRY: garship@mobileemail.vodafone.net

---------------------------------------------------------------------

Garship Ltd
123 Minories
London
EC3N 1NT
Tel. 020.3002.4106
Fax. 020.7488.2056
EMail: mail@garship.com

Dan McSweeney  mob: +44 7802 572295
Shah Gazzali      mob: +44 7904 115944
Tony Harryman    mob: +44 7930 835412

--
No virus found in this incoming message.
Checked by AVG.
Version: 7.5.503 / Virus Database: 269.17.1/1182 - Release Date: 12/12/2007 11:29

---------------------------------------------------------------------

Garship Ltd
123 Minories
London
EC3N 1NT
Tel. 020.3002.4106
Fax. 020.7488.2056
EMail: mail@garship.com

Dan McSweeney  mob: +44 7802 572295
Shah Gazzali      mob: +44 7904 115944
Tony Harryman    mob: +44 7930 835412

2/29/2008

From West of England Insurance Services (Lux) S.A.

RECOMMENDED
THE BALTIC AND INTERNATIONAL CONFERENCE
UNIFORM GENERAL CHARTER (AS REVISED 1922 AND 1976)
INCLUDING "F.I.O." ALTERNATIVE, ETC.
(To be used for trades for which no approved form is in force)
CODE NAME: "GENCON"

Part 1

| 1. Shipbroker | 2. Place and Date |
|---|---|
| BTB SHIPPING CO LTD | SHANGHAI,27TH,NOV,2007 |
| | 4. Charterers/Place of Business (Cl. 1) |
| 3. Owners/Place of Business (Cl. 1) | Prime Global Commodities Trading Limited |
| HEADOWNERS : COSCO SHIPPING CO.,LTD DISP.OWNERS: SUNS INTERNATIONAL SHIPPING CO.,LTD | 5. GRT / NRT (Cl. 1) |
| | SEE CLAUSE 19 |
| 6. Vessel's Name (Cl. 1) | 8. Present position (Cl. 1) |
| MV LE RONG see cl 19 | — |
| 7. Deadweight cargo carrying capacity in tons (abt). (Cl. 1) | |
| SEE CLAUSE 19 | |
| 9. Expected ready to load (abt). (Cl. 1) | |
| SEE CLAUSE 23 | |
| 10. Loading Port or Place (Cl. 1) | 11. Discharging Port or Place (Cl. 1) |
| 1G3BP MISURATA (CHTR GURANTEE 10.5M DRAFT) | 1 SB 1SP China including Yangtze river ports (but no more west port than changzhou)to be declared with 10 days after vessel sail from loading port. |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; If full and complete cargo not agreed state "part cargo") (Cl. 1) |
|---|
| 20000mt 10pct MOLOO OF LAWFUL HARMLESS IRON ORE IN BULK INCLUDING PELLETS,chtrs to confirm none concentrate grade |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| SEE CLAUSE 25 | SEE CLAUSE 26 |
| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl.6) |
| F.I.O.S. | a) Laytime for Loading |
| | SEE CLAUSE 24 |
| 17. Shippers (state name and address) (Cl. 6) | b) Laytime for discharging |
| — | SEE CLAUSE 24 |
| | c) Total laytime for loading and discharging |
| 18. Demurrage rate (loading and discharging) (Cl. 6) | 19. Cancelling date (Cl. 10) |
| SEE CLAUSE 27 | SEE CLAUSE 23 |

| 20. Brokerage commission and to whom payable (Cl. 7) |
|---|
| 2.5% ADDRESS COMMISSION PLUS 1.25% COMMISSION TO BTB SHIPPING CO LTD |

21. Additional clauses covering special provisions, if agreed.

CLAUSE 19-38 INCLUSIVE AS ATTACHED HERETO,ARE DEEMED TO BE FULLY INCORPORATED IN THIS CHARTER PARTY

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

Computer generated form printed by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen, using software which is the copyright of Strategic Software Ltd.

Approved by
The Documentary Committee of the General
Council of British Shipping, London
The Documentary Committee of the Japan
Shipping Exchange, Inc., Tokyo

Copyright, published by the Baltic
and International Maritime
Conference (BIMCO), Copenhagen

### PART II
### "Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

| | |
|---|---|
| 1 | **1.** It is agreed between the party mentioned in Box 3 as Owners |
| 2 | of the steamer or motor-vessel named in Box 5, of the |
| 3 | gross/nett Register tons indicated in Box 6 and carrying about |
| 4 | the number of tons of deadweight cargo stated in Box 7, now |
| 5 | in position as stated in Box 8 and expected ready to load |
| 6 | under this Charter about the date in-dicated in Box 9, and the |
| 7 | party mentioned as Charterers in Box 4 that: |
| 8 | The said vessel shall proceed to the loading port or place |
| 9 | stated in Box 10 or so near thereto as she may safely get and |
| 10 | lie always afloat, and there load a full and complete cargo (if |
| 11 | shipment of deck cargo agreed same to be at Charterers' risk) |
| 12 | as stated in Box 12 (Charterers to provide all mats and/or |
| 13 | wood for dunnage and any separations required the Owners |
| 14 | allowing the use of any dunnage wood on board if required) |
| 15 | which the Charterers bind themselves to ship, and being so |
| 16 | loaded the vessel shall proceed to the discharging port or |
| 17 | place stated in Box 11 as ordered on signing Bills of |
| 18 | Lading or so near thereto as she may safely get and lie |
| 19 | always afloat and there deliver the cargo on being paid freight |
| 20 | on delivered or intaken quantity as indicated in Box 13 at |
| 21 | the rate stated in Box 13. |

**2. Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager,
And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause be responsible or from unseaworthiness of the vessel on loading or commencement of the voyage or at anytime whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or in-sufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

**3. Deviation Clause**
The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and / or assist vessels in all situations, and also to deviate for the purpose of saving life and / or property.

**4. Payment of Freight** — See Clause 26
~~The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.
Cash for vessels ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of ex-change, subject to two per cent. to cover insurance and other expenses.~~

**5. Loading, Discharging Costs**
~~(a) Gross Terms
The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay the necessary men on shore or on board the lighters to do the work there, vessel only heaving the cargo on board.
If the loading takes place by elevator, cargo to be put free in vessel's holds, Owners only paying trimming expenses.
Any piece and/or package of cargo over two tons weight, shall be loaded stowed and discharged by Charterers at their risk and expense. The cargo to be received by Merchants at~~

| | |
|---|---|
| 76 | the Charterers or their Agents, free of any risk, liability and |
| 77 | expense whatsoever to the Owners. |
| 78 | ~~The Owners shall provide winches, motive power and~~ |
| 79 | ~~winchmen from the Crew if requested and permitted; if not, the~~ |
| 80 | ~~Charterers shall provide and pay for winchmen from shore~~ |
| 81 | ~~and/or cranes, if any. (This provision shall not apply if vessel~~ |
| 82 | ~~is gearless and stated as such in Box 16).~~ See Clause 35 |
| 83 | ~~* indicate alternative (a) or (b), be agreed, in Box 15.~~ |

**6. Laytime** — See Clauses 24
~~* (a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays ex-cepted, unless used, in which event time actually used shall count.
The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays ex-cepted, unless used, in which event time actually used shall count.
(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon and at 6 a.m. next working day if notice given during office hours after noon.
Notice at loading port to be given to the Shippers named in Box 17.
Time actually used before commencement of laytime shall count.
Time lost in waiting for berth to count as loading or discharging time, as the case may be.
* indicate alternative (a) or (b) as agreed, in Box 16.~~

**7. Demurrage** — See Clause 27
~~Demurrage at the rate stated in Box 18 per day or pro rata for any part of a day, payable by the charterer at ports of loading and discharging.~~

**8. Lien Clause**
Owners shall have a lien on the cargo for freight dead-freight, demurrage and damages for detention. Charterers shall remain re-sponsible for dead-freight and demurrage (including damages for detention), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for deten-tion) incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

**9. Bills of Lading** — See Clause 29
~~The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.~~

**10. Cancelling Clause**
Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.

**11. General Average**
General average to be settled according to York-Antwerp Rules, 1974, Proprietors of cargo to pay the cargo's share in

# PART II
## "Gencon" Charter (As Revised 1922 and 1976)
Including "P.I.O." Alternative, etc.

148 Indemnity for non-performance of this Charterparty, proved
149 damages, not exceeding estimated amount of freight.

150 **13. Agency – See Clause 28**
151 ~~In every case the Owners shall appoint his own Broker or~~
152 ~~Agent both at the port of loading and the port of discharge.~~

153 **14. Brokerage**
154 A brokerage commission at the rate stated in Box 20 on the
155 freight earned is due to the party mentioned in Box 20.
156 In case of non-execution at least 1/3 of the brokerage on the
157 estimated amount of freight and dead-freight to be paid by the
158 Owners to the Brokers as indemnity for the latter's expenses
159 and work. In case of more voyages the amount of indemnity to
160 be mutually agreed.

161 **15. GENERAL STRIKE CLAUSE**
162 Neither Charterers nor Owners shall be responsible for the
163 con-sequences of any strikes or lock-outs preventing or
164 delaying the fulfilment of any obligations under this contract.
165 If there is a strike or lock-out affecting the loading of the
166 cargo, or any part of it, when vessel is ready to proceed
167 from her last port or at any time during the voyage to the
168 port or ports of loading or after her arrival there Captain or
169 Owners may ask Charterers to declare, that they agree to
170 reckon the laydays as if there were no strike or lock-out.
171 Unless Charterers have given such declaration in writing (by
172 telegram, if necessary) within 24 hours, Owners shall have the
173 option of cancelling this contract. If part cargo has already
174 been loaded, Owners must proceed with same, (freight
175 payable on loaded quantity only) having liberty to complete
176 with other cargo on the way for their own account
177 If there is a strike or lock-out affecting the discharge of the
178 cargo on or after vessel's arrival at or off port of discharge and
179 same has not been settled within 48 hours Receivers shall
180 have the option of keeping vessel waiting until such strike or
181 lock-out is at an end against paying half demurrage after
182 expiration of the time provided for discharging or of ordering
183 the vessel to a safe port where she can safely discharge
184 without risk of being detained by strike or lock-ut Such orders
185 to be given within 48 hours after Captain or Owners have
186 given notice to Charterers of the strike or lock-out affecting
187 the discharge. On delivery of the cargo at such port, all
188 conditions of this Charterparty and of the Bill of Lading shall
189 apply and vessel shall receive the same freight, as if she
190 had discharged at the original port of destination, except that
191 if the distance of the sub-stituted port exceeds 100 nautical
192 miles, the freight on the cargo delivered at the substituted port
193 to be increased in proportion.

194 **16. War Risks ("Voywar 1950")**
195 (1) In these clauses "War Risks" shall include any blockade or
196 any action which is announced as a blockade by any
197 Government or by any belligerent or by any organised body,
198 sabotage, piracy, and any actual or threatened war, hostilities,
199 warlike operations, civil war, civil com-motion, or revolution.
200 (2) If at any time before the Vessel commences loading, it
201 appears that performance of the contract will subject the
202 Vessel or her Master and crew or her cargo to war risks at any
203 stage of the adventure, the Owners shall be entitled by letter
204 or telegram despatched to the Charterers, to cancel this
205 Charter.
206 (3) The Master shall not be required to load cargo or to
207 continue loading or to proceed on or to sign Bill(s) of Lading
208 for any adventure on which or any port at which it appears that
209 the Vessel, her Master and crew or her cargo will be subjected
210 to war risks. In the event of the exercise by the Master of his
211 right under this Clause after part or full cargo has been loaded
212 the Master shall be at liberty either to discharge such cargo
213 at the loading port or to proceed therewith. In the latter
214 case the Vessel shall have liberty to carry other cargo for
215 Owners' benefit and accordingly to proceed to and load or
216 discharge such other cargo at any other port or ports
217 whatsoever, backwards or forwards, although in a contrary
218 direction to or out of or beyond the ordinary route. In the event
219 of the Master election to proceed with part cargo under this

224 port, or the last of the loading ports, if more than one, it
225 appears that further performance of the contract will subject
226 the Vessel her Master and crew or her cargo, to war risks
227 the cargo shall be discharged or if the discharge has been
228 commenced shall be completed, at any safe port in vicinity of
229 the port of discharge as may be ordered by the Charterers. If
230 no such orders shall be received from the Charterers within 48
231 hours after the Owners have despatched a request by
232 telegram to the Charterers for the nomination of a substitute
233 discharg-ing port, the Owners shall be at liberty to
234 discharge the cargo at any safe port which they may, in their
235 discretion, decide on and such discharge shall be deemed to
236 be due fulfilment of the contract of affreightment. In the event
237 of cargo being discharged at any such other port, the Owners
238 shall be entitled to freight as if the discharge had been
239 effected at the port or ports named in the Bill(s) of Lading or to
240 which the Vessel may have been ordered pursuant thereto.
241 (5) (a) The Vessel shall have liberty to comply with any
242 directions or recommendations as to loading, departure,
243 arrival, routes, ports of call, stoppages, destination zones
244 waters discharge delivery or in any other wise whatsoever
245 (including any direction or recom-mendation not to go the
246 port of destination or to delay proceeding thereto or to
247 proceed to some other port) given by any Government or by
248 any belligerent or by any organised body engaged in civil war,
249 hostilities or warlike operations or by any person or body
250 acting or purporting to act as or with the authority of any
251 Government or belligerent or of any such organised body or
252 by any committee or person having under the terms of the war
253 risks insurance on the Vessel, the right to give any such
254 directions or recommendations. If, by reason of or in
255 compliance with any such direction or recom-mendation,
256 anything is done or is not done, such shall not be deemed a
257 deviation.
258 (b) If, by reason of or in compliance with any such directions
259 or re-commendations, the Vessel does not proceed to the port
260 or ports named in the Bill(s) of Lading or to which she may
261 have been ordered pursuant thereto, the Vessel may proceed
262 to any port as directed or recommended or to any safe port
263 which the Owners in their discretion may decide on and there
264 discharge the cargo. Such discharge shall be deemed to be
265 due fulfilment of the contract of affreightment and the Owners
266 shall be entitled to freight as if discharge had been effected at
267 the port or ports named in the Bill(s) of Lading or to which the
268 Vessel may have been ordered pursuant thereto.
269 (6) All extra expenses (including insurance costs) involved in
270 discharg-ing cargo at the loading port or in reaching or
271 discharging the cargo at any port as provided in Clauses 4
272 and 5(b) hereof shall be paid by the Charterers and / or
273 cargo owners. and the Owners shall have a lien on the cargo
274 for all moneys due under these Clauses.

275 **17. GENERAL ICE CLAUSE**
276 Port of loading
277 (a) In the event of the loading port being inaccessible by
278 reason of ice when vessel is ready to proceed from her last
279 port or at any time during the voyage or on vessel's arrival or
280 in case frost sets in after vessel's arrival, the Captain for fear
281 of being frozen in is at liberty to leave without cargo, and this
282 Charter shall be null and void.
283 (b) If during loading the Captain, for fear of vessel being
284 frozen in deems it advisable to leave, he has liberty to do so
285 with what cargo he has on board and to proceed to any
286 other port or ports with option of completing cargo for
287 Owners' benefit for any port or ports including port of
288 discharge. Any part cargo thus loaded under this Charter to be
289 forwarded to destination at vessel's expense but against
290 payment of freight, provided that no extra expenses be
291 thereby caused to the Receivers, freight being paid on
292 quantity delivered (in proportion if lumpsum), all other
293 conditions as per Charter.
294 (c) In case of more than one loading port, and if one or
295 more of the ports are closed by ice, the Captain or Owners to
296 be at liberty either to load the part cargo at the open port
297 and fill up elsewhere for their own account as under section
298 (b) or to declare the Charter null unless Charterers

## PART II
"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

302 (a) Should ice (except in the Spring) prevent vessel from
303 reaching port of discharge Receivers shall have the option of
304 keeping vessel waiting until the re-opening of navigation and
305 paying demurrage, or of ordering the vessel to a safe and
306 immediately accessible port where she can safely discharge
307 without risk of detention by ice. Such orders to be given within
308 48 hours after Captain or Owners have given notice to
309 Charterers of the impossibility of reaching port of destination.
310 (b) If during discharging the Captain for fear of vessel being
311 frozen in deems it advisable to leave he has liberty to do so
312 with what cargo he has on board and to proceed to the
313 nearest accessible port where she can safely discharge.
314 (c) On delivery of the cargo at such port all conditions of
315 the Bill of Lading shall apply and vessel shall receive the
316 same freight as if she had discharged at the original port of
317 destination, except that if the distance of the substituted port
318 exceeds 100 nautical miles the freight on the cargo delivered
319 at the substituted port to be increased in proportion.



# CHARTER PARTY TO MV LE RONG

## RIDER CLAUSES
## DATED 27TH NOVEMEBER, 2007

THE FOLLOWING TERMS TO BE FULLY INCOPPORATED IN THIS CHARTER PARTY.

18.ALL NEGOTIATIONS AND EVENTUAL FIXTURE TO BE STRICKLY PRIVATE AND CONFIDENTIAL.

19.PERFORMING VESSEL: MV " LE RONG " OR SUB
 MPP DWT  22284MT ON 10M SSW
BLT:1999
FLG:P.R.CHINA
LOA/BM:  169/25.2M
GRT/NRT: 15442/8589
HO/HA: 4/7
CRANE SWL/POSITION/HOLDS SERVED:
        No.1   S.W.L. 15T FOR HATCH No.1 & 2
        No.2   S.W.L. 40T FOR HATCH No.2 & 3
        No.3   S.W.L. 15T FOR HATCH No.3 & 4

ALL DETAILS ABOUT

NO OTHER LIMITATION FOR CAPTIONED VSL

20. CARGO/QUANTITY:

20000mt 10pct MOLOO OF LAWFUL HARMLESS IRON ORE IN BULK INCLUDING PELLETS,chtrs to confirm none concentrate grade

21.LOAD PORT: 1GSBP MISURATA (CHTR GUARANTEE MIN 10.5M DRAFT SW)

22.DISCHARGE PORT: 1 SB 1SP  China including Yangtze river ports (but no more west port then changzhou)to be declared with 10 days after vessel sail from loading port.

23.LAYCAN:  25TH DEC TO 10TH JAN,2008

OWNER WILL DECLARE NARROW SPREAD LAYCAN BEFORE 10DAYS ETA L/PORT.

24.LOADING/DISCHARGE RATE:

- LOADRATE: 5000 MTONS PWWD FH EX UU

- DISCHRATE: 10000MT PWWD SHINC OF 24 CONS HRS AT D/PORT



-AT LOAD FHEX UNLESS USED WHICH CASE TIME USED TO COUNT

- 12  HOURS TT AT BENDS ULESS SOONER COMMENCE IN WHICH CASE ACTUAL TIME USED TO COUNT

- NOR CAN BE TENDERED ATDNSHIC BENDS. LAYTIME TO    COMMENCE 12 RUNNING HRS AFTER NOR TO BE TENDERED. IF  LDG COMM EARLIER, ACTUAL TIME USED TO COUNT AS LAYTIME.

- NOR SHALL BE TENDERED WITH CLEAN HOLDS /HATCH AND READY IN ALL RESPECTS TO LOAD AT ANY TIME AFTER VSL HAS ARRIVED AT LOADPORT WWWW, NOR SHALL BE TENDERED AT CHANG JIANG KOU AT DISPORT WWWW .

- SHIFTING TIME AND EXPENSES BETWEEN LOADING/DISCHG BERTHS TO BE FOR CHARTERER'S . THE FIRST SHIFTING TIME FM ANCHORAGE TO BERTHS NOT TO COUNT AS LAYTIME UNLESS ON DEMURAGE.

- LIGHERING/LIGHTERAGE IF ANY TO BE FOR CHARTERERS ACCOUNT,
                         X FENDERING CLAUSE .

25.FREIGHT RATE:

USD 77.00 PMT FIOT BSS 1/1 BSS

26.FREIGHT PAYMENT:
                         TO BE RELEASED ONCE CHRS BANK IRREVOCABLY
                         CONFIRM FREIGHT PAYMENT IN AUS NOMINATED BANK

100% FRT TO BE PAID TO OWRS' NOMINATED BANK A/C WITHIN 3 BANKING DAYS    B/L TC smoorp-rate
AFTER SIGN/REL BILLS OF LADING BUT ALWAYS BEFORE BREAKING BULK, BS/L    demurrage aus
MARKED 'FREIGHT PAYABLE AS PER CHARTER PARTY'. FREIGHT TO BE DEEMED AS   arc/freation
EARNED  UPON  CARGO  ON-BOARD,  DISCOUNTLESS,  NON-RETURNABLE  SHIP      clause
AND/OR CARGO LOST OR NOT.

DEM/DES IF ANY AT LOADPORT TB SETTLED WITH FREIGHT PAYMENT.DEM/DES IF ANY AT DISPORT TB SETTLED W/IN 10 DAYS AFTER COMPLETION OF DISCH AND PRESENTATION OF RELEVANT DOCUMENTS FROM PORT/AGENT/MASTER.

27.DEM/DES: USD 20000 PDPR / HD BENDS

28.AGENTS: CHTRS AGT BOTH ENDS SUB TO REASONABLE PORT D/A

29 BILLS OF LADING:

- BSL FIGURES  SHALL BE AS PER DRAFT  SURVEY TO BE CARRIED OUT JOINTLY BY MARINE  SURVEYOR  AND MASTER A/O CH.MATE

IF ORIGINAL B/L CANNOT BE PRESENTED AT DISPORT OWRS & MASTER AGREE

TO DISCH/RELEASE CGO AGAINST CHRTS AND RCVRS LOI IN OWNERS PNI CLUB WORDING, TO CUSTOMS CUSTODY UNTIL B/L PRESENTED.

30. TAXES/DUES:

ANY TAXES AND/OR DUES ON CARGO TO BE FOR CHARTERERS ACCOUNT,

SAME ON VESSEL AND FREIGHT TO BE FOR OWRS' ACCOUNT

31. OAP (IF ANY) FOR CHRTRS A/C.

32. OVERTIME TO BE FOR THE ACCOUNT OF ORDERING. IF ORDERED BY PORT AUTHORITY DUE TO ABOVE AND/OR VESSEL'S FAULT, SAME TO BE FOR OWNERS ACCOUNT; OTHERWISE, TO BE FOR CHARTERER'S ACCOUNT EXCEPT FOR OFFICERS AND CREW OVERTIME WHICH SHALL ALWAYS BE FOR OWNERS ACCOUNT.

33. OTHERS AS PER STANDARD GENCON CHARTER PARTY 1994 EDITION.

34. GENERAL AVERAGE, IF ANY, TO BE SETTELD ACCORDING TO YORK/ANTWERP RULE 1974.

35. GA/ARBITRATION IN LONDON AND ENGLISH LAW TB APPLIED

36. War risks clause "voywar 1993" to be deemed to be incorporated into this charter party.

37. BIMCO ISM CLAUSE INCORPORATED IN CP

"From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this charter party, the Owners shall ensure that both the Vessel and the Company (as defined by the ISM code) comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and the Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or the company to comply with the ISM code should be for the Owner's account"

38. BIMCO ISPS CLAUSE INCORPORATED IN CP

(A)      (i)      From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (I.S.P.S. Code) in relation to the Vessel, the Owners shall procure that

both the Vessel and "the Company" (as defined by the I.S.P.S. Code) shall comply with the requirements of the I.S.P.S. Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (C.S.O.).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the I.S.P.S. Code or this clause shall be for the Owners' account.

(B)

(i)  The Charterers shall provide the C.S.O. and the Ship Security Officer (S.S.O.)/Master with their full style contact details and any other information the Owners require to comply with the I.S.P.S Code.

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C)

Provided that the delay is not caused by the Owners' failure to comply with their obligations under the I.S.P.S. Code, the following shall apply:

(i)  Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the I.S.P.S. Code.

(ii)  Any delay resulting from measures imposed by a port facility or by any relevant authority under the I.S.P.S. Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D)

Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the I.S.P.S. Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E)

If either Party makes any payment which is for the other Party's account according to this clause, the other Party shall indemnify the paying Party.

**Exhibit B**

CODE NAME "CONGENBILL" EDITION 1994

| Shipper : | OWNER:EPIDAURUS S.A . |
| SIPEX FOR INVESTMENT AND PROMOTION OF EXPORT | |
| KHEIREDINE PACHA 9  MED ALI ANNABI STREET | |
| 3 RD FLOOR 1002 TUNIS / TUNISIA | |

Consignee :
TO ORDER

Notify address :
CHINA MARINE SHIPPING AGENCY

| Vessel : | Port of Loading |
| M/V MARGARITA M | MISURATA PORT , LIBYA |

Port of discharge :
RIZHAO/LANSHAN  PORT ,CHINA

Gross weight

24472.039 MT

IRON ORE FINES
COUNTRY OF ORIGIN LIBYA
PACKING: IN BULK
MARKED "FREIGHT PAYABLE AS PER CHARTER PARTY"

"CLEAN SHIPPED ON BOARD"

LOADING PORT : MISURATA PORT,LIBYA
DISCHARGING PORT : RIZHAO/LANSHAN  PORT,CHINA

Freight payable as per charter – Party dated **12.12.2007**

Freight Advance

Received on Account of freight

Time used loading........................... days ................... hours

SHIPPED at The loading port apparent Good Order and condition on board the Vessel for carriage to the port of discharge ...
contents and value unknown in witness whereof the master or agent of the said vessel has signed the number of bills of lading indicated accomplished the others shall be void for condition of carriage see overleaf.

| Freight payable at | Place and date of issue. MISURATA 26/12/2007 |
| NUMBER OF ORIGINAL B/L                    3/3 | Signature AS AGENTS ON BEHALF OF THE MASTER REYNALDO B. DE ISIDRO |

This fax was sent from the West of England Insurance Services (Luxembourg) S.A.

## ATTORNEY VERIFICATION

State of New York     )
                      ) ss.:
County of New York  )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
William L. Juska

Sworn to before me this
4th day of March, 2008

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/08